Filed 9/17/20  P. v. Marshall CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RANDALL KAREEM MARSHALL,<br><br>    Defendant and Appellant. | A156255<br><br>(San Francisco City & County<br> Super. Ct. No. 17015667.<br> SCN228315) |

Defendant Randall Kareem Marshall appeals from judgment after a jury convicted him of second degree murder, residential burglary, two charges of first degree attempted robbery, and commercial burglary.  Defendant contends the trial court violated his due process rights by admitting evidence of a prior uncharged act and allowing the prosecution to impeach him with highly inflammatory evidence on a collateral matter; he further contends both evidentiary errors resulted in cumulative error that requires reversal. Defendant also challenges the trial court's imposition of a restitution fine and various fees without holding a hearing on his ability to pay, in violation of his state and federal due process rights under *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with various crimes committed over the course of the morning and early afternoon of August 20, 2017.  We discuss only those

facts necessary to resolve the issues raised on appeal. We provide some additional background in our legal analysis below.

## A. *August 20, 2017*

### 1. *Altercation with Raymond Best*

About 9:20 a.m. on August 20, 2017, Jennifer M. was stopped at a red light at the intersection of St. Joseph's Avenue and Geary Boulevard across from Kaiser Permanente San Francisco Medical Center (Kaiser). She saw a man she later identified as defendant on the corner carrying two shopping bags and wearing what looked like a surgical mask over his mouth. He put the two bags down and put his hands on his knees, as if he was winded after running. He was holding what appeared to be a large Tanqueray gin bottle.

Jennifer M. also saw a man, later identified as Raymond Best, bent over as though locking up a bicycle, tying his shoe, or reading a newspaper at a newspaper stand, about 25 feet behind defendant. Jennifer saw defendant sprint toward Best with the bottle raised in his right hand. As Best rose up, defendant hit him with the bottle on the top of his head. Best fell to the ground. Before he could get up, defendant hit him on the head a second time. Jennifer did not see anything in Best's hands, nor did it appear Best came after defendant.

Defendant ran back to the corner where he left his bags, grabbed the bags, and ran across the street. Jennifer M. followed defendant, took photos of him with her cell phone camera, and then drove to her friend Hadley H.'s house and called 911. Jennifer showed Hadley her photos of defendant.

Nicholas S. and Helen V. had exited Kaiser when they saw defendant. He had a piece of white tape over his mouth and was holding a green liquor bottle. Helen said defendant looked "super angry." Nicholas and Helen walked around him.

2

Nicholas S. saw Best sitting on the sidewalk with a couple of bags next to him. Defendant was about six to eight feet away from Best and had his back to him. Nicholas kept defendant in his peripheral vision, then something caused him to turn around and look directly at defendant. Helen turned around when she heard shouting.

Nicholas S. was about 15 to 20 feet away from Best when defendant came around behind Best, lifted the green bottle up over his head, and brought it down directly on top of Best's head, hitting him very hard. Helen V. said the bottle looked like a gallon-size green Tanqueray gin bottle. Nicholas said Best did not see it coming. Helen said defendant and Best may have been facing each other and Best may have been trying to stand up. Neither Nicholas nor Helen saw Best with anything in his hand. Defendant picked up the bags sitting next to Best and ran off up Geary Street.

Helen V. saw defendant turn down Lyon Street. Jennifer M.'s friend, Hadley H., also saw defendant on Lyon Street. After Jennifer placed the call to 911, Hadley went on a run and saw defendant, who she recognized from the photos Jennifer had shown her. Defendant was not wearing a shirt, was quickly pushing a blue recycling bin, and was carrying a cane. His body movements were erratic and he appeared angry.

Best received medical treatment at Kaiser and was transported to San Francisco General Hospital. Best spent six days in a coma, then died on August 26, 2017.

### 2. *Residential Burglary and Attempted Robbery*

About 10:00 or 10:30 a.m. on August 20, 2017, D.S. and Kaitlyn H. were in their home on Lyon Street. D.S. was in her bedroom when she heard the side gate squeak. She looked out the window and saw defendant enter through her gate and close it behind him. She had never seen defendant

3

before and she thought it was strange he was not wearing a shirt because it was not a hot day.  He was carrying a curved walking cane but was holding the middle of the cane and not using it to assist himself with walking.  She also noticed he was pushing a blue recycling bin into her yard that had not been there before.

Defendant walked around to the back porch and D.S. and Kaitlyn H. went into the kitchen at the back of the house.  The two women looked out through the closed blinds and saw defendant.  When defendant saw D.S., he stepped closer to the kitchen door and she could see him clearly.  Defendant told D.S. that he had been evicted from the house.  He smiled and told her, " 'You recognize me.  Open the door.' "  D.S. told him he needed to leave.  He responded that he knew nobody lived there.[1]

D.S. told defendant again he needed to leave but he moved closer to the door.  He leaned on the corner of a dryer, then motioned toward a pair of shoes D.S. left on the porch and said, " 'I have your shoes.' "  Then defendant held up a sheet with directions for the dryer and said, " 'See, I know nobody lives here.' "  D.S. told defendant she would call the police if he did not leave.

At that point, defendant stood up, kicked in the locked door, breaking the door jamb, and entered the kitchen.  Defendant raised his voice and demanded the two women's cell phones.  He was agitated and aggressive, and he raised the cane in his hand while demanding their phones.  Defendant tried to grab Kaitlyn H.'s phone, but she moved her hand out of his reach.  The two women stepped further back into the kitchen and D.S. began

---

[1] D.S. testified the upstairs flat had been vacant for two and a half years.  About five weeks earlier, she heard someone upstairs at 11:00 p.m.  The police came and removed a homeless woman who did not have permission to be there.

screaming. Each time she took a breath, defendant told her, " 'Shut up. Give me your phone.' " This happened five or six times.

D.S. kept screaming until defendant left through the same door through which he had entered. Kaitlyn H. called 911 and spoke with an operator. The police arrived and looked around. The blue recycling bin D.S. had seen was no longer there, and the door jamb and kitchen door lock were broken and had to be replaced.

### 3. Commercial Burglary

On August 20, 2017, Melvin A. was doing construction work at a building on Sacramento Street in San Francisco. The bottom floor of the building was occupied by a store called "Anthem" and the top floor was office space and one residential living space. Melvin A. left the building at some point to get caulk and locked the gate. When he returned, defendant was upstairs, sitting at a table, eating. Defendant had a cane with him.

When Melvin A. had arrived at work that morning, there was a box at the bottom of the stairs. Defendant had moved the box upstairs and opened it. The name of the person on the package was "Jay," the manager for the offices. Defendant claimed "Jay" was his aunt and he was helping his aunt move in. Defendant was eating food and drinking a bottle of water that had been in Anthem's refrigerator.

When Melvin A. asked defendant what he was doing there, defendant said he lived there. Melvin A. asked defendant to leave, but defendant refused, then lifted his cane above his head and waved it back and forth. Defendant kept repeating he lived there and he was helping someone move in. Melvin locked defendant in and left the building to wait outside for the police.

5

The police were called. They arrived around 2:10 p.m. and detained defendant. Defendant told the officers he lived there. One of the bags defendant had with him contained a 1.75-liter green Tanqueray gin bottle and an orange San Francisco County jail bracelet bearing defendant's name. There was no blood on the gin bottle or inside the bag. There was no damage to the building, and no evidence that anything other than the eaten food and water bottle was missing.

The police did a "cold show" identification procedure with Jennifer M. and Helen V. then took defendant to the police station.

## B. Prior Uncharged Conduct

### 1. Mallory H. Incident

Six days earlier, Mallory H. was walking home about 1:00 a.m. carrying a pizza. As she approached Van Ness Street, she noticed defendant on the other side of the street making eye contact with her. When she crossed the street, defendant asked if he could have her pizza. She said, "No," and kept walking. Defendant followed her, weaving in and out of parked cars and giggling. She asked him, "What are you doing?," but he just continued to giggle and kept following her.

When Mallory H. got to the entrance of her apartment, defendant was right behind her, so close she did not believe she had time to get inside safely. She faced defendant and asked him why he was doing this. He giggled again and then replied, " 'Do you live here?' " When she asked him again why he was doing this, he laughed and said, " 'Don't you know who you are?' . . . 'You're my wife.' " As defendant "paced" up the street, Mallory put in the door code, entered quickly, and put all of her weight on the door to try to shut it. She heard running footsteps, and then defendant began kicking the door.

6

She screamed "at the top of [her] lungs" and eventually her husband came out of their apartment and held the door while she ran inside and called 911.

The police responded and took Mallory H. to a spot nearby where they had detained a suspect. She identified defendant as the man who had followed her. Defendant had damaged the door of the building.

At trial, defendant testified he had been trying to flirt with Mallory H. that night but she was not interested, so he told her, " 'Have a good night,' " and stopped walking with her. He denied walking with her all the way to her apartment, following her, telling her she was his wife, and trying to open or kicking in her door.

### 2. *Masturbation in Jail*

About 30 minutes after defendant spoke with Mallory H., the police arrested him. On cross-examination, defendant testified that when he was arrested, he had 0.8 or 0.9 gram of methamphetamine on his person. In order to avoid being criminally charged with possession of methamphetamine, defendant orally ingested the drug on the way to the police station. Defendant testified it was the largest amount of the drug he had ever taken. After he was processed and placed in a cell, defendant became "a little hot and sexually aroused," so he took off his clothes and began to masturbate. The police rushed in, handcuffed him, and placed him in a safety cell.

### 3. *Pizza Parlor Incident*

During cross-examination, defendant was shown a video of an incident at a pizza parlor on July 20, 2017. In the video, defendant punched the owner of the pizza parlor.

On cross-examination, defendant testified that the business was closing and he had asked if they had any leftover pizza. The employees said they

would check with the owner and defendant waited to speak with the owner. The owner came out and told defendant to "get the fuck out." Defendant was getting ready to leave, but he was not leaving fast enough, so the owner threw his things into the street, at which point defendant punched him in the face. Defendant denied that he had refused to leave.

## C. *Defense Testimony*

As noted, defendant testified in his own defense at trial. Defendant was homeless in July and August 2017. With regard to the Raymond Best incident, defendant testified that on the morning of August 20, he was carrying bags that contained everything of value he owned, including his money, two liquor bottles he found, and his EBT card. He set the bags down and walked and talked with a homeless couple. Defendant testified he turned around and found Best and another man going through his bags. Defendant ran towards them and yelled, " 'Hey man, what the fuck are you doing? That's my shit.' "

Defendant grabbed his bags to retrieve his belongings. Best started punching defendant hard in the head, defendant punched Best, and a fight ensued. After Best hit defendant hard in the mouth, defendant took his blue bag and walked back to the corner while Best and the other man continued going through his other bags. Defendant looked in his blue bag to see what he had left and determine if it was worth going back for his other bags. He removed the gin bottle from his bag and set it on the ground to be able to look further in the bag. Defendant saw that Best and the other man no longer had their hands on his bags. He thought he could retrieve them without a confrontation. Defendant was "making haste" to his belongings when Best rushed at him.

Best tackled defendant and they fell to the ground, wrestling. As defendant was getting up, he saw a can of Coke on the ground. Defendant reached for the unopened can of Coke and hit Best over the head with it. When defendant hit him, Best fell backwards. Defendant denied hitting Best with the gin bottle. Defendant testified he did not intend to kill Best, and only wanted to get away. Defendant did not know how many times he hit Best, but he did not hit him again after he fell to the ground. Defendant gathered his bags that were near Best, then picked up his blue bag. Defendant could see Best was on his feet, walking toward him, so he ran across the street.

Surveillance video showed defendant walking up Geary Boulevard, toward Lyon Street, with his bags in his left hand and the Coke can in his right. In the video, the Coke can fell and rolled away. Defendant testified that after he turned the corner, he felt safe. He took his shirt off because it was hot. He walked to a house where the day before he had stored a blue recycling bin which he used as a makeshift personal trailer in which to store his things.

The day before, defendant ran into his friend Lauren. Lauren took him to a house on Lyon Street where they could "hook up," i.e. have sex. She told him the house was a squatter's place. She led him down an alley, opened a gate, and told him he could store his recycling bin there.

When he reached the house on Lyon Street after the incident with Best, defendant noticed a cane hanging on the gate door. He picked up the cane because his knee had given out in the fight with Best and he thought he might able to use it later. Defendant put his bags in the recycling bin then pushed his bin into the alley and closed the gate.

9

Defendant went around to the back of the apartment to see if Lauren was there. He saw a person looking at him through the blinds; he thought it was Lauren. He could not hear the woman clearly; he thought Lauren said, "come in." He used the knob to open the door. He did not get angry or kick the door. The door just opened, it was not latched.

When he entered, he realized Lauren was not there and asked where she was. D.S. started screaming, then Kaitlyn H. came into the kitchen and started screaming as well. Defendant asked Kaitlyn H. for her phone because he wanted to call Lauren. Defendant denied intending to steal anything. He did not threaten or physically assault the women.

After the incident with D.S. and Kaitlyn H., defendant went to Sacramento Street and stored his bin in an alley. He needed to use the restroom but did not want to go in public. He thought Anthem might have a bathroom he could use.

Defendant had not intended to steal anything at Anthem. When he got to the top of the stairs, however, he saw the bathroom was under construction and he could not use it. Defendant relieved himself outside, then went back into the building. He went into the kitchen where he took some water and leftovers from the refrigerator which he eventually consumed. No one was there, but defendant thought he would wait and see if he could talk to someone about whether they had work for him. While he waited, defendant made a gin drink and went outside to smoke a cigar. He estimated he spent "at least a couple of hours" at Anthem.

When defendant saw Melvin A. arrive in his truck, he went downstairs to talk to him about work. As they walked back to Anthem and up the stairs, he noticed a box on the stairs and picked it up and carried it upstairs. He did

not tell Melvin A. he lived there and did not pick up his cane or wave it at Melvin A. Defendant said Melvin A. did not tell him to leave.

Melvin A. left and the "[n]ext thing you know," defendant heard cars screeching, looked out the window, and saw police with their weapons drawn. Defendant came downstairs and the officers handcuffed him.

### D. Charges, Verdicts, and Sentencing

An information filed November 21, 2017 charged defendant with the murder of Raymond Best by use of a glass bottle, a dangerous or deadly weapon (Pen. Code,[2] §§ 187, subd. (a), 12022, subd. (b)(1); count I); first degree residential burglary with an allegation that it was committed when a person other than an accomplice was present (§§ 459, 667.5, subd. (c)(21); count II); two counts of attempted first degree robbery (§§ 211, 664; counts III & IV); misdemeanor vandalism (§ 594, subd. (b)(2)(A); count V); and second degree commercial burglary (§ 459; count VI).

Before the cause was submitted for deliberations, the district attorney stated it was proceeding only on a theory of second degree murder. Defendant was found guilty as charged on all counts except misdemeanor vandalism, which was dismissed. The jury also found true the allegations that defendant used a deadly weapon in committing the murder and that people were present during the residential burglary.

On January 2, 2019, the court sentenced defendant to a term of 15 years to life for the murder, imposed a term of one year for the dangerous weapon enhancement, and an aggregate determinate term of six years eight months for the residential and commercial burglaries and two counts of attempted robbery, for a total sentence of 22 years 8 months to life.

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

## II. DISCUSSION

### A. *Evidence of Prior Uncharged Conduct—Mallory H.*

Defendant first contends the trial court abused its discretion in admitting evidence of the incident with Mallory H. that occurred six days before he entered the residence of D.S. and Kaitlyn H.

#### 1. *Additional Background*

Before trial, the defense moved to exclude, and the prosecution moved to admit, other-crimes evidence including the incident involving Mallory H. The prosecution's motion argued it should be allowed to introduce the incident with Mallory H. to show defendant's intent in the charged residential burglary. Defendant argued the incident lacked the requisite similarity to the charged crimes to be admissible on the issue of defendant's intent and the evidence was unduly prejudicial.

The court did not take testimony at the hearing on the motions in limine but stated it had reviewed the transcript of the preliminary hearing. In ruling on the motions, the trial court observed, "The prior uncharged incident [with Mallory H.] has some similarities to the residential burglary that is charged here in which the defendant allegedly kicked a door and thereby broke into an occupied residence after being told to leave by one of two female residents . . . ." The trial court acknowledged "differences, certainly" between the two incidents, but noted the "least degree of similarity between the crimes that is needed to prove intent, and of course, the prior uncharged conduct need only be proven by a preponderance of the evidence." The court found sufficient similarity between the two incidents and concluded the probative value of the evidence outweighed its prejudicial effect, and that it would not "require undue consumption of time or confuse the issue or

12

mislead the jury." The court ruled it would give "an appropriate limiting instruction under CALCRIM [No.] 375."

At the conclusion of Mallory H.'s testimony, the trial court admonished the jury the evidence was being admitted for a limited purpose or purposes. The court said: "I wanted to clarify one thing, which is regarding [Mallory H.]'s testimony. As you have heard, she is testifying about an incident that occurred on August 14, 2017. I think you're aware of this, but I do want to make it clear [defendant] is not facing criminal charges in this case arising out of the incident that [Mallory H.] has been testifying to. You are hearing evidence of the incident as it may bear on the criminal charges in this case. And in particular, the Court in a pretrial ruling admitted or allowed the introduction of evidence on this incident as it may bear on [defendant]'s intent in allegedly committing the residential burglary that is one of the charges . . . in this case." The court noted the evidence "may also be admitted for another limited purpose," and reiterated, "I just wanted to make it clear at this point this is not an incident for which [defendant] is directly facing criminal charges in this case. The evidence you're hearing is admitted for limited purpose or purposes, and we will make that clear in the instructions at the end of the case. I just didn't want anybody to be confused."

When the court instructed the jury with CALCRIM No. 375 at the conclusion of the case, it told the jury that if it found defendant had committed the offense of attempting to enter the residence of Mallory H. on August 14, 2017, "you may but are not required to consider that evidence [for] the limited purpose—there is a typo there, that should be singular—for limited purpose of deciding whether the defendant acted with intent to commit theft as charged [in] Count 2 [(residential burglary)]." The court also

13

instructed the jury to consider the similarity or lack of similarity of the offenses and admonished: "Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all of other evidence [*sic*]."

### 2. Analysis

In general, evidence of a person's character or trait of character is inadmissible to prove the person's conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) Evidence a person committed a "crime, civil wrong, or other act" is admissible if it is relevant to prove a fact other than a person's disposition to commit such an act, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . . ." (*Id.*, subd. (b).)

Evidence of uncharged conduct can be relevant to prove intent because " '[t]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal intent accompanying such an act . . . .' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "To be admissible, there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented. The least degree of similarity is needed when, as here, the evidence is offered to prove intent." (*People v. Jones* (2011) 51 Cal.4th 346, 371.)

Even when evidence of uncharged conduct is otherwise admissible, it must be excluded if its probative value is outweighed by its potential to prejudice the fact finder against a party, to confuse the issues, or to consume undue amounts of time. (Evid. Code, § 352; *People v. Mungia* (2008) 44 Cal.4th 1101, 1130.)

We review a trial court's rulings under Evidence Code sections 1101 and 352 for an abuse of discretion. (*People v. Mungia, supra*, 44 Cal.4th at p. 1130.) " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329.)

Applying these standards, we conclude the trial court acted within its discretion when it admitted evidence of the prior uncharged incident with Mallory H. Defendant insists the evidence regarding the incident with Mallory H. was inadmissible to prove intent to steal because defendant did not steal or attempt to steal anything from her, and at most committed an act of misdemeanor vandalism. But courts have long held that intent to commit theft can be inferred from the fact of a forcible and unlawful entry. (See *People v. Jones* (1962) 211 Cal.App.2d 63, 71–72 ["Burglarious entry may be inferred from the fact that appellant unlawfully and forcibly entered the home of another"]; *People v. Fitch* (1946) 73 Cal.App.2d 825, 827 [intent to commit theft "could be inferred from the forcible and unlawful entry alone"].) Here, in both the incident with Mallory H. and the incident with D.S. and Kaitlyn H., the evidence supports a finding defendant broke the door in an attempt to forcibly enter the premises. Thus, the court could reasonably infer

15

the evidence of an attempted forcible entry is not just evidence of vandalism but intent to steal.

We likewise reject defendant's claim that the trial court abused its discretion because the evidence was more prejudicial than probative. " 'An exercise of discretion under Evidence Code section 352 will be affirmed unless it was arbitrary, capricious, or patently absurd and the ruling resulted in a miscarriage of justice.' " (*People v. Bell* (2019) 7 Cal.5th 70, 105.) As explained above, the evidence that defendant attempted to force entry to Mallory H.'s residence was relevant on the issue of intent. Moreover, the evidence was not particularly inflammatory, and certainly not any more inflammatory than the evidence regarding the charged offenses of residential burglary and murder. (See *People v. Ewoldt*, *supra*, 7 Cal.4th at p. 405 [fact that evidence regarding uncharged conduct was no stronger and no more inflammatory than charged crimes decreased potential for prejudice]; *People v. Foster*, *supra*, 50 Cal.4th at p. 1332 [violent and sexual prior crimes evidence was less inflammatory than evidence defendant repeatedly stabbed victim].)

Finally, even assuming the trial court erred in admitting the evidence of the incident with Mallory H., we conclude any such error was harmless because defendant has not shown a reasonable probability he would have obtained a more favorable verdict had the court excluded the evidence. (*People v. Carter* (2005) 36 Cal.4th 1114, 1152 [error in admitting evidence of uncharged misconduct does not require reversal unless it is reasonably probable outcome would have been more favorable had the evidence been excluded].) The court admonished the jury when Mallory H. testified, and again during instructions at the conclusion of trial, that the evidence was admissible on the issue of intent with respect to the charged crime and

16

explained to the jury it must not consider the evidence to conclude defendant has a bad character or is disposed to commit the charged crime. Thus, the jury was properly instructed not to use the evidence to conclude defendant committed the charged crime.

Defendant contends the court's instruction that the jury could consider the evidence for purposes of evaluating defendant's credibility was extremely prejudicial and rendered his trial unfair. For several reasons we reject the argument. First, defendant's counsel did not object to the instruction at trial. Moreover, defendant's argument equates the use of prior misconduct evidence for *credibility* purposes to inadmissible propensity evidence. But while the latter purpose is clearly prohibited, prior misconduct evidence may be admissible when offered for the purpose of evaluating witness credibility. [3] (Evid. Code, § 1101, subd. (c) ["Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."]; see *People v. Clark* (2011) 52 Cal.4th 856, 931 ["A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352."].) Further, as noted, the court

_____

[3] At the hearing on the motion in limine after the court ruled the Mallory H. incident would be admissible on the issue of intent, the prosecution also informed the court it was seeking to admit the evidence for impeachment purposes under Evidence Code section 1103. The trial court stated it had not understood that previously. Defense counsel acknowledged the prosecution was seeking to admit the incident "for both impeachment and as far as [Evidence Code section] 1101[, subdivision] (b)," confirmed the evidence would be "coming in their case in chief" whether defendant testified or not, and then remarked, "So I think we have, then, enough information about what we need to talk to the jury about, then." Though neither party discusses this colloquy, we note the ambiguity in the record about whether the Mallory H. evidence could be used for impeachment purposes.

expressly instructed the jury not to use evidence of the Mallory H. incident to conclude defendant has a bad character or was disposed to commit the crime. We presume the jury followed these instructions, and no evidence in the record suggests otherwise. (*People v. Harris* (2013) 57 Cal.4th 804, 842.)

Defendant complains that the evidence regarding the Mallory H. incident portrayed him as a "dangerous, violent, unpredictable, and perhaps even mentally ill individual who engaged in random acts of violence." He contends he was also prejudiced because the prosecution's closing argument focused on his " 'scary' " behavior toward Mallory H. rather than his intent to steal from her. But the prosecutor twice explained to the jury in closing argument that the evidence regarding Mallory H. was relevant to whether defendant had an intent to steal from D.S. and Kaitlyn H.[4] Further, a large number of trial witnesses testified to a wide range of defendant's behaviors and their own feelings during their interactions with him. With regard to the murder charge, three witnesses testified they saw defendant hit Raymond Best over the head with a gin bottle. Among them, they testified he appeared "intense," "really, really angry," "super angry," "crazy," "intimidating," "scary," "unpredictable," and was "behaving erratically." Hadley H. testified defendant appeared "angry," "scary," was "acting erratically," and his behavior was "not normal." D.S. and Kaitlyn H. testified that defendant made strange comments, raised his voice, was agitated and aggressive, kicked in their door, and tried to grab their phones. They testified it was a

---

[4] The prosecutor told the jury: "You can consider Mallory's incident to the extent it sheds light on [defendant]'s intent during the [D.S.] incident." Later in her argument she reiterated: "So in this case, obviously the burglary charge applies to [D.S. and Kaitlyn H.'s] home. Did he enter that home with an intent to commit theft? You get to think about Mallory's incident when making that decision."

"scary situation," and that they were "really scared." Melvin A. testified defendant claimed his aunt lived in the commercial property, helped himself to food from a neighboring business, moved and opened a package, refused to leave the premises when asked, and raised a cane over his head waving it back and forth. The prosecution presented video evidence that a month before the crimes at issue, defendant punched the owner of a pizza parlor when he told defendant to "get the fuck out" of his restaurant. Defendant does not challenge any of this evidence on appeal. Moreover, defendant testified at length to his own detailed version of the events over the course of several days during trial, giving the jury ample opportunity to evaluate his credibility based on his own testimony and demeanor. Though defendant argues his credibility was the key issue at trial, in light of the overwhelming amount of evidence bearing on that issue, we conclude the admission of the Mallory H. evidence was not so prejudicial as to make it more probable he would have achieved a different result in its absence.

Finally, the evidence against defendant was strong. Three eyewitnesses testified they saw defendant hit Raymond Best over the head with a gin bottle and that Best did not appear to provoke the attack or hit defendant. Though defendant argues there was conflicting medical and forensic evidence regarding the murder charge, the multiple percipient witnesses were shown to have no reason to lie and their accounts were consistent with one another and contradicted defendant's. As to the residential burglary, D.S. and Kaitlyn H. both testified defendant broke down their kitchen door and demanded their cell phones. Defendant claimed he opened their door by turning a doorknob, but the physical evidence showed their door was broken. Given the strength of the other evidence against

19

defendant, it is unlikely the result would have been different had evidence of the Mallory H. incident been excluded.

For the same reasons, we reject defendant's argument that admission of the incident with Mallory H. was a violation of his due process rights. The "routine application of state evidentiary law does not implicate defendant's constitutional rights." (*People v. Brown* (2003) 31 Cal.4th 518, 545.) " 'The admission of evidence results in a due process violation only if it makes the trial fundamentally unfair. [Citation.] "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." ' " (*People v. Coneal* (2019) 41 Cal.App.5th 951, 972.) As discussed above, the evidence that defendant attempted to forcibly enter Mallory H.'s door supported an inference he intended to commit theft. But even if such an inference was not reasonable, the evidence was not of such character as to render defendant's trial fundamentally unfair.

## B. *Impeachment with Evidence of Masturbation*

Defendant next contends the trial court erred in admitting the evidence he stripped naked in his jail cell and masturbated, arguing the evidence was more prejudicial than probative under Evidence Code section 352.

### 1. *Additional Background*

At trial, defense counsel moved to exclude evidence that defendant was masturbating in jail on August 14, 2017. The prosecution argued evidence of hypersexuality and combative behavior are signs of methamphetamine abuse. The trial court expressed concern the evidence might be prejudicial, but ultimately ruled it was potentially probative of the amount of

20

methamphetamine defendant ingested, "which bears not only potentially on his conduct, but potentially also on his ability to perceive and remember what happened and testify reliably to those events." The court allowed the prosecution to cross-examine defendant on the incident but cautioned not to disclose any lurid details.

On cross-examination, defendant testified he had ingested close to a gram of methamphetamine before arriving at the jail. He stated once he was placed in the cell, "I got a little hot and sexually aroused, and I started masturbating back there. And officers were alerted to what I was doing. How they knew, I don't know. And they rushed in there and handcuffed me and placed me in a safety cell." The prosecutor asked: "You were not combative with sheriff's personnel?" Defendant responded he was not. The prosecutor then asked: "But you stripped your clothes off. And you were masturbating?" Defendant confirmed he was.

### 2. *Analysis*

We agree that the evidence has minimal probative value. Though arguably it would be probative of the amount of methamphetamine defendant consumed on August 14, he consumed the methamphetamine six days before the crimes at issue and it likely would have had little bearing on his behavior on August 20. Nonetheless, we conclude defendant has not shown a reasonable probability of a more favorable result had the evidence been excluded. As discussed above, the jury heard substantial evidence regarding strange behavior by defendant both on the day of the crime and in a pizza parlor a month before. Defendant also explained that the masturbation occurred when he took the largest amount of the drug he had ever taken. A toxicology expert opined that defendant taking off his clothes and masturbating was consistent with someone who had ingested a larger

21

quantity of methamphetamine than he is used to and does not have a tolerance for it.  Moreover, the testimony regarding masturbation was extremely brief, was offered by defendant, and the prosecutor asked only one question to confirm that defendant had been masturbating in his cell.  In light of these facts, we conclude any error in admitting the testimony was harmless.

## C. *Cumulative Error*

Defendant argues the two evidentiary errors in admitting the uncharged acts taken together constituted cumulative error that rendered his trial fundamentally unfair.  As we have discussed above, however, admission of the uncharged incident with Mallory H. was not error, and the fleeting reference to masturbating in his cell was not unduly prejudicial in the context of the entire trial.  On this record, there was no cumulative error.

## D. **Dueñas**

In addition to his prison term, the court imposed a $200 court operations assessment fee (§ 1465.8), a $150 conviction assessment fee (Gov. Code, § 70373), a $40 theft fee (§ 1202.5), a $1,500 restitution fine (§ 1202.4), and a suspended $1,500 parole revocation restitution fine (§ 1202.45).  Defendant asks this court to vacate the fees and stay imposition of the restitution fine unless and until the prosecution can show he has the present ability to pay under *People v. Dueñas*, *supra*, 30 Cal.App.5th 1157 (*Dueñas*).  Alternatively, he asks this court to remand for an ability to pay hearing.  We disagree because on the merits, defendant is not entitled to relief under *Dueñas*.

### 1. *The* **Dueñas** *Case*

In *Dueñas*, the defendant, a homeless probationer who suffered from cerebral palsy and was unable to work, was convicted of her fourth offense of

22

driving with a suspended license.  Because she was unable to work, Dueñas

lost her driver's license when she could not pay assessments for juvenile

citations she received as a teenager.  Over the ensuing years, Dueñas was

convicted of several misdemeanors because she continued to drive without a

license and spent weeks in jail in lieu of paying additional fees and fines, but

she remained unable to pay off her debt.  In the most recent case, she was

placed on summary probation and ordered to pay a criminal conviction

assessment, a court operations assessment, and a restitution fine within

three years.  (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1163.)  Dueñas

objected and asked for an ability to pay hearing.  At the hearing, she

produced undisputed evidence establishing her inability to pay.  (*Id.* at

pp. 1162–1163.)  Although the court assured Dueñas she would not be

" 'punished' " if she was unable to pay, it also stated, " 'Those [sums] will go

to collections without any further order from this court.' "  (*Id.* at p. 1163.)

The trial court rejected the defendant's argument that the imposition of the

assessments and the fine without consideration of her ability to pay them

violated her constitutional rights to due process and equal protection.  (*Ibid.*)

The Court of Appeal reversed, holding that "the assessment provisions

of Government Code section 70373 and Penal Code section 1465.8, if imposed

without a determination that the defendant is able to pay, are . . .

fundamentally unfair [and] imposing these assessments upon indigent

defendants without a determination that they have the present ability to pay

violates due process under both the United States Constitution and the

California Constitution."  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.)  The

appellate court reversed the order imposing the assessments and directed

the trial court to stay the execution of the restitution fine "unless and until

23

the People prove that [the defendant] has the present ability to pay it."[5] (*Id.* at pp. 1172–1173.)

### 2. Dueñas *Does Not Warrant a Remand*

Division Two of the Second District Court of Appeal, in *People v. Hicks* (2019) 40 Cal.App.5th 320 (*Hicks*), review granted November 26, 2019, S258946 recently explained: "To reach its holding, *Dueñas* wove together two distinct strands of due process precedent. [¶] The first strand secures a due process-based right of access to the courts. . . . requir[ing] courts to waive court costs and fees that would otherwise preclude criminal and civil litigants from prosecuting or defending lawsuits or from having an appellate court review the propriety of any judgment. [Citations.] [¶] The second strand erects a due process-based bar to incarceration based on the failure to pay criminal penalties when that failure is due to a criminal defendant's indigence rather than contumaciousness." (*Id.* at p. 325.)

We agree with *Hicks* that the first strand "does not dictate *Dueñas*'s bar on imposing fees because the imposition of assessments, fines and fees does not deny a criminal defendant access to the courts." (*Hicks*, *supra*, 40 Cal.App.5th at p. 326.) Here, the imposition of the fees and fines disputed by defendant "in no way interfered with defendant's right to present a defense at trial or to challenge the trial court's rulings on appeal." (*Ibid.*) Indeed, they were not imposed until after the trial was over, and except for the fact of their imposition, are not otherwise challenged.

---

[5] The California Supreme Court is currently considering whether trial courts must determine a criminal defendant's ability to pay fines, fees, and assessments before imposing them. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted on specified issues Nov. 13, 2019, S257844.)

Likewise, the second strand does not dictate *Dueñas*'s bar on imposing fees because their imposition, without more, does not result in incarceration for nonpayment due to indigence. The cases prohibiting incarceration for indigence alone rest on the notion that " '[*f*]*reedom from imprisonment* . . . lies at the heart of the liberty that [the due process] [c]lause protects.' " (*Hicks, supra,* 40 Cal.App.5th at p. 326, italics added by *Hicks*; accord, *People v. Kingston* (2019) 41 Cal.App.5th 272, 280.) Thus, at the time of sentencing, imposing a fee or fine upon a criminal defendant does not require immediate incarceration and as a result, does not infringe on defendant's liberty interest. (*Hicks,* at p. 326; *Kingston,* at p. 280.) Although *Dueñas* determined that by imposing the court assessments, indigent defendants were subject to " 'additional punishment' " because their failure to pay could give rise to civil judgments with significant negative consequences, it "cites no authority for the proposition that those consequences constitute 'punishment' rising to the level of a due process violation." (*People v. Caceres* (2019) 39 Cal.App.5th 917, 927, review denied Jan. 2, 2020.)

Because it is wholly speculative that "additional punishment" discussed in *Dueñas* will come to pass, we find it unnecessary to decide whether there was any infringement here on defendant's due process or other constitutional rights. In *Dueñas,* the defendant had already suffered "cascading consequences" because of "a series of criminal proceedings driven by, and contributing to, [her] poverty," and she had already been ordered to pay the charges at issue by the end of her probation period. (*Dueñas, supra,* 30 Cal.App.5th at pp. 1163–1164.) In contrast, nothing about the circumstances here suggests defendant's criminal proceedings had contributed to his homelessness. (See *People v. Caceres, supra,* 39 Cal.App.5th at p. 928 [likelihood of committing criminal threats not

25

affected by one's financial circumstances].) Thus, even assuming *Dueñas* was correctly decided on its facts, the hardship in the instant matter is not akin to the one imposed in that case.

Moreover, the situation in which defendant has put himself—a lengthy sentence in state prison—does not implicate the same due process concerns at issue in the factually unique *Dueñas* case. Defendant, unlike Dueñas, does not face incarceration because of an inability to pay assessments and fines. Defendant is in prison because he was found guilty of murder, burglary, and attempted robbery.

Also unlike *Dueñas*, the trial court in this case imposed a restitution fine above the statutory minimum. Section 1202.4, subdivision (c) expressly allows the court to consider a defendant's ability to pay in such circumstances, and subdivision (d) provides the court "shall consider any relevant factors, including, but not limited to, the defendant's ability to pay" in setting the amount of the fine in excess of the statutory minimum. Thus, at least as to the restitution fine, defendant "had every incentive to object" and forfeited his ability to pay argument by failing to do so in the trial court. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033, review den. Sept. 18, 2019, S256881; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073, review den. Dec. 11, 2019, S258563.)

Lastly, *Dueñas* does not support a remand to the trial court to consider whether the restitution fine imposed on defendant should be stayed. Because of section 1202.4's "prohibition on considering the defendant's ability to pay the minimum fine," *Dueñas* concluded "the criminal justice system punishes indigent defendants in a way that it does not punish wealthy defendants." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1170.) As the court explained, "In most cases, a defendant who has successfully fulfilled the conditions of probation

for the entire period of probation has an absolute statutory right to have the charges against him or her dismissed" and be relieved of their resulting penalties and disabilities.  (*Ibid*.)  If, however, "a probationer cannot afford the mandatory restitution fine, through no fault of his or her own he or she is categorically barred from earning the right to have his or her charges dropped and to relief from the penalties and disabilities of the offense for which he or she has been on probation, no matter how completely he or she complies with every other condition of his or her probation," and must instead "appeal to the discretion of the trial court and . . . persuade [it] that dismissal of the charges and relief from the penalties of the offense is in the interest of justice."  (*Id*. at pp. 1170–1171.)  Unlike Dueñas, defendant has not been placed on probation, and no issue of his entitlement to expungement exists.  Nor, assuming he is presently unable to pay the restitution fine, does he explain how its imposition has or may result in his being treated differently than wealthy defendants "solely and exclusively [because of his] poverty."  (*Id*. at p. 1171.)  We therefore conclude defendant is not entitled to a remand under *Dueñas*.

### III.  DISPOSITION

The judgment is affirmed.

MARGULIES, ACTING P. J.

WE CONCUR:


BANKE, J.


SANCHEZ, J.


A156255
*People v. Marshall*

28